UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | CRIMINAL ACTION |
| VERSUS | * | NO. 22-75 |
| HERBERT COOPER | * | SECTION L |

### ORDER & REASONS

Before the Court is Defendant Herbert Cooper's motion to suppress all evidence seized, and statements resulting from a warrantless stop and search by New Orleans Police Department. R. Doc. 42. The Government opposes the motion, R. Doc. 46. A hearing on the motion was held on February 1, 2024. After considering the briefing, oral argument, and the applicable law, the Court rules as follows.

I.  BACKGROUND

This criminal action was brought against Defendant Herbert Cooper for violations of the Controlled Substances Act and the Federal Gun Control Act. Mr. Cooper has not been rearraigned and has a trial date set for May 13, 2024, as to four counts in an indictment: (1) possession with intent to distribute a controlled substance; (2) possession of a firearm in furtherance of a drug crime; (3) and (4) felon in possession of a firearm. R. Doc. 1.

These charges stem from the viewing of Real Time Crime footage of the intersection of North Gayoso and Iberville Streets by New Orleans Police Department Detective Chad Cockerham on March 13, 2022. R. Doc. 42-1 at 1. The Government avers that Det. Cockerham was reviewing the footage because almost three weeks prior, a triple homicide occurred at that intersection. R. Doc. 46 at 2. Det. Cockerham video-surveilled the area because the Government received information that retaliation for the shooting may occur at the end of a second line parade that took

place on March 13, 2022.[1] *Id.* The Government classifies this intersection as a "high-crime area." *Id.*

Around 5:15 p.m. on that day, Det. Cockerham observed a male in a black "Dickie" shirt and jeans standing in the middle of the street and talking to another individual sitting in a white car. *Id.* The male was later identified to be Defendant Herbert Cooper. *Id.* Det. Cockerham further observed Mr. Cooper unlock the trunk of a Dodge Challenger, retrieve a bag, and place it in the driver's seat. *Id.* Soon after, another male approached Mr. Cooper at the door of the driver's seat of the Challenger. *Id.* Mr. Cooper handed items to this male in exchange for currency. *Id.* To access the currency used to pay Mr. Cooper, the male removed a firearm from his pocket. *Id.* After this encounter, Mr. Cooper then replaced the bag in the Challenger's trunk and the other male walked back to his vehicle. *Id.* at 3. Around 5 minutes later, Mr. Cooper continued his conversation with the individual in the white car. *Id.* The Government avers that during this conversation, Mr. Cooper fixed his shirt and waistband and then put his hand on an object in his waistband. *Id.* It further argues that "Cooper held the object concealed in his waistband in a similar way to an individual holding a gun." *Id.* Moments later, Mr. Cooper lifted his shirt which revealed an object with a "distinctive blue floor plate." *Id.*

Around 5:30 p.m., Mr. Cooper once again took the bag from out of his trunk and leaned into the driver's seat to place the bag inside the car. *Id.* at 4. He then adjusted his shirt and waistband, which revealed the object in Mr. Cooper's waistband for a second time. *Id.* at 4-5. Based on his years of experience working on drug trafficking and firearm investigations, Det. Cockerham believed the object was a concealed weapon. *Id.* at 5.

Det. Cockerham informed NOPD Lieutenant Batiste of his surveillance who then told

---

[1] The Government provides that the Keeping It Real Second Line occurred on that same date. *Id.* at 2.

Officer Enamorado to conduct an investigatory stop. *Id.* When Officer Enamorado arrived at the scene in a marked police car, Mr. Cooper began walking away. *Id.* Officer Enamorado then instructed Mr. Cooper to stop and show him his hands. *Id.* The Government claims that Mr. Cooper then fled from the officer and a foot chase ensued through an "open wooded lot and behind several residences". *Id.* Another officer, Officer Jones, detained Mr. Cooper on Conti and North Dupre Streets. Mr. Cooper did not have a firearm on him when apprehended. *Id.* A subsequent police search of Mr. Cooper's path led them to recover a black Glock .40 caliber weapon with a blue floor plate near a sidewalk on Conti Street. *Id.* The Government submitted Body Work Camera footage from March 13, 2022, to show the firearm. *Id.* Mr. Cooper was then arrested and charged with violations of Illegal Carrying of a Weapon, La. R.S. 14:95, Carrying a Firearm in a Firearm Free Zone, La. R.S. 14:95.2, and Flight from an Officer, La. R.S. 14:108. *Id.* After Mr. Cooper's arrest, Det. Cockerham obtained a search warrant for the Dodge Challenger, which he believed to belong to Cooper. R. Doc. 41 at 2. A search of the vehicle revealed ten pounds of marijuana and various pills. *Id.*

While in custody at Orleans Justice Center, Mr. Cooper alleges that Det. Cockerham listened to phone calls he made to his mother about a safe, which contained cash and marijuana. *Id.* Detective William Thomas was informed of these facts and obtained a search warrant for the home and seized the safe which contained $12,000, a firearm, and drug paraphernalia. *Id.* Det. Thomas also allegedly recovered a Glock gun box which had the same serial number as the Glock recovered near Conti Street. *Id.*

On March 24, 2022, Det. Thomas interviewed Mr. Cooper at Orleans Justice Center. *Id.* at 3. Though Mr. Cooper was represented by counsel at this point, no counsel was present at the interview. *Id.* Mr. Cooper further alleges that he was not read his Miranda rights and did not

execute a waiver form. *Id.* During this interview, Mr. Cooper claimed ownership of the items located in the safe. *Id.* Det. Thomas also gave Mr. Cooper a Notice of Pending Forfeiture Form which Mr. Cooper signed. *Id.* On April 22, 2022, Mr. Cooper was indicted in this court for the pending charges. R. Doc. 1.

## II. PRESENT MOTION

### a. The Parties' Briefing

On October 30, 2023, Mr. Cooper filed the instant motion to suppress. R. Doc. 42. He argues that law enforcement lacked reasonable suspicion to detain him. R. Doc. 42-1 at 3-6. Mr. Cooper argues that Det. Cockerham believed he saw Mr. Cooper carrying a concealed weapon; however, even if this were true, Mr. Cooper argues that this alone does not demonstrate a crime was being committed. *Id.* at 3. He contends that carrying concealed firearms with a permit is permissible in Louisiana and avers that Louisiana is a "shall issue" state with respect to concealed carry permits. *Id.* at 5. As a result, Mr. Cooper argues that "Detective Cockerham had no basis to believe that he did not qualify for and possess a 'valid concealed handgun permit'" and thus, law enforcement lacked reasonable suspicion to stop Mr. Cooper. *Id.* at 4. Accordingly, Mr. Cooper moves to suppress all evidence and statements.[2]

In opposition, the Government first argues that the surveilling officer had reasonable suspicion to believe Mr. Cooper was carrying a concealed firearm. R. Doc. 46. It argues that the video evidence shows Mr. Cooper adjusting his pants, revealing an object with a blue floor plate in his waistband. *Id.* at 8. It avers that Det. Cockerham believed the object to be a concealed firearm based on his years of experience as a New Orleans detective and how Mr. Cooper gripped the

---

[2] Regarding Mr. Cooper's motion to suppress statements made to Det. Thomas, the Government informed the Court that it does not intend to use these statements in its case-in-chief. R. Doc. 46 at 6-7. Accordingly, the Court need not comment further on the admissibility of these statements at this time.

object. *Id.* Considering Det. Cockerham's inferences paired with Mr. Cooper's presence in a "high-crime area," the Government avers that further investigation of Mr. Cooper was necessary. *Id.* It also argues other sections of this Court have held that law enforcement has reasonable suspicion when observing what appears to be a concealed weapon on a person. *Id.* at 9-11.

### b. Suppression Hearing

On February 1, 2024, the Court held a hearing on the matter. The Court heard testimony from Det. Cockerham, who observed the Real Time Crime footage on the day of the incident, March 13, 2022. In addition to calling Det. Cockerham to the stand, the Government offered into evidence four videos from the footage that Det. Cockerham monitored on the day of the incident. Det. Cockerham testified that the videos were the same videos he saw on March 13, 2022.

As the videos were played in court, Det. Cockerham explained his observations of the events leading to the *Terry* stop. He testified that he saw Mr. Cooper retrieve the bag from his trunk and then place it in the front seat. Shortly after, another male approached Mr. Cooper and a transaction occurred. During this transaction, He testified that he saw Mr. Cooper give the male an object in exchange for currency, provided by other male. He noted, and as further confirmed by the video evidence, that the other male removed a firearm from his pocket and tucked it under his left arm to retrieve the currency. After this transaction, the video showed the male walking back to his car with the gun tucked under his arm for several seconds before he replaced it in his pocket.

Det. Cockerham further testified that he saw Mr. Cooper adjust his shirt, pants, and waistband, in a fashion that revealed an object with a blue floor plate. Det. Cockerham testified that—based on his work experience—in addition to revealing the blue floor plate, Mr. Cooper held the object in a way that he has seen other individuals hold firearms.

Based on his observations up until this point, Det. Cockerham testified that he informed

NOPD to conduct an investigatory stop of Mr. Cooper. The last video that the Government offered into evidence showed Mr. Cooper's interactions with Officer Enamorado. While there was no sound to go along with the video, the visual evidence demonstrates the officer briefly speaking to Mr. Cooper and lifting his hands up. Mr. Cooper responds by shaking his head before picking up his pace. As the video was playing in court, Det. Cockerham testified that this interaction reveals Officer Enamorado asking Mr. Cooper to show his hands and Mr. Cooper refusing to oblige. The video continues and shows Officer Enamorado quickening his pace to reach Mr. Cooper. The officer speaks in Mr. Cooper's direction again, which prompts Mr. Cooper to take flight. The video ends shortly after Mr. Cooper runs out of the frame.

After the Government questioned Det. Cockerham and introduced video evidence, counsel for Mr. Cooper questioned Det. Cockerham on why he was looking at this area specifically and not other areas that were close to where the second line parade concluded. Det. Cockerham responded by saying that he was not sure which direction the retaliatory violence would come from, and he was monitoring this location because there was a camera nearby. Defense counsel further questioned Det. Cockerham's reasoning for stopping Mr. Cooper because there was no hard evidence that Mr. Cooper was selling drugs and after he was detained, he was only charged with a weapons-related crime instead of a drug-related crime. Det. Cockerham answered explaining that though there was no hard evidence at the time, he justified the stop based on what he witnessed in conjunction with his work experience. On redirect, the Government asked if Mr. Cooper ever indicated to Officer Enamorado that he had a weapon, and Det. Cockerham testified that Mr. Cooper did not provide that information to the officer.

During oral argument, Mr. Cooper argued that New Orleans law enforcement lacked reasonable suspicion to justify the stop. He further argues that law enforcement must be able to

point to articulable facts to support their reasonable suspicion at the inception of the stop. Additionally, he avers that Louisiana law allows for individuals to carry concealed weapons. He argues that at the beginning of the stop, law enforcement did not know whether he was carrying drugs or whether Mr. Cooper had a permit to lawfully carry a concealed weapon. Thus, he argues the evidence seized as a result of the *Terry* stop must be suppressed.

In opposition, the Government argued that law enforcement had reasonable suspicion to conduct the *Terry* stop. First, it avers that Det. Cockerham observed what he believed to be a hand-to-hand drug transaction in a high-crime area where at least one individual in the transaction had a gun. It argues that minutes later, Det. Cockerham observes Mr. Cooper adjust his clothing to reveal an object with a blue floor plate. Next, it argues Det. Cockerham reasonably infers from his experience that the object is a firearm based on Mr. Cooper's manipulation of the object. Lastly, it argues that Det. Cockerham reasonably believed that Mr. Cooper's flight from Officer Enamorado indicated that he did not have a permit to carry a concealed weapon.

### III. APPLICABLE LAW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." *Herring v. U.S.*, 555 U.S. 135, 139 (2009) (quoting *Arizona v. Evans*, 514 U.S. 1, 10 (1995)). The Supreme Court's Fourth Amendment jurisprudence has established "an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial." *Id.* Warrantless searches are "per se unreasonable unless they fall within a few narrowly defined exceptions." *U.S. v. McKinnon*, 681 F.3d 203, 207 (5th Cir. 2012) (quoting *United States v. Kelly*, 302 F.3d 291, 293 (5th Cir. 2002)). When the Government conducts a search or seizure without a warrant or probable cause, the Government bears the burden of showing by a preponderance of the evidence that the search or seizure falls

within an exception and was constitutional. *U.S. v. Roch*, 5 F.3d 894, 897 (5th Cir. 1993).

One of these exceptions is known as a *Terry* stop. When conducting a *Terry* stop, "officers may briefly detain an individual on the street for questioning . . . when they possess reasonable, articulable suspicion of criminal activity." *United States v. Scroggins*, 599 F.3d 433, 441 (5th Cir. 2010) (internal citation omitted); *Terry v. Ohio*, 391 U.S. 1 (1968). To justify the intrusion, law enforcement "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Terry*, 392 U.S. at 21. Law enforcement is permitted to consider the totality of circumstances when forming reasonable suspicion. *See Scroggins*, 599 F.3d at 441. "Police must be able to 'articulate specific facts that support[] their belief that there was *something illegal* afoot…, even if they [can] not link those facts to a particular specific crime.'" *United States v. Muse*, No. 18-75, 2018 WL 6523383 *1, *8 (E.D. La. Dec. 12, 2018) (citing *United States v. Pack*, 612 F.3d 341, 356 (5th Cir. 2010), *opinion modified on denial of reh'g*, 622 F.3d 383 (5th Cir. 2010)) (alterations in original). Factors germane to the reasonable suspicion analysis include: (1) whether the area where the stop occurred is a "high crime area;" (2) "whether the individual engaged in 'unprovoked flight upon noticing the police;'" and (3) "whether the individual looked nervous or made furtive gestures or suspicious movements." *United States v. Tuggle*, 284 F. App'x 218, 223 (5th Cir. 2008) (citing *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000)); *United States v. Watson*, 953 F.2d 895, 897 (5th Cir. 1992)).

Further, a party urging a motion to suppress "has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of [their] Fourth Amendment rights." *United States v. Wallace*, 885 F.3d 806, 809 (5th Cir. 2018) (quoting *United States v. Smith*, 978 F.2d 171, 176 (5th Cir. 1992)).

IV.     **ANALYSIS**

Here, Mr. Cooper bears the burden of proving whether law enforcement lacked reasonable suspicion to justify the March 2022 *Terry* stop. *Wallace*, 885 F.3d at 809. For the Government to prevail, it must demonstrate "a minimal level of objective justification for the officer's actions, measured in light of the totality of circumstances." *United States v. Wangler*, 987 F.2d 228, 230 (5th Cir. 1993). With these standards in mind, the Court finds that law enforcement had reasonable suspicion when stopping Mr. Cooper.

The Court reaches its conclusion after considering the *Illinois v. Wardlow* factors, which are discussed below. 528 U.S. at 119. First, the Court considers whether the stop occurred in a high crime area. As explained by the Government, Det. Cockerham was monitoring the area of North Gayoso and Iberville streets because of a triple homicide occurred a few weeks prior to the incident less than half a mile away. Further, Det. Cockerham testified that he focused on this area specifically on March 13, 2022, because of information he received that retaliation for the homicide may occur where a second line parade was to disband that same day. The parade was to conclude at 2901 Conti Street.[3] Since the triple homicide and conclusion of the second line parade happened less than half a mile from where Mr. Cooper was stopped by New Orleans law enforcement, the Court finds that the stopped occurred in a high crime area. *Id.*

The Court next considers the events that transpired before law enforcement arrived on the scene. Of note is the transaction between Mr. Cooper and the other male. The Court finds particularly alarming that to access his currency, the male removed a firearm and placed it under his arm for the entire transaction. The video evidence revealed that the male continued to have the firearm in this unsecure position in the moments after the transaction was over. Accordingly, the

---

[3] This address is less than three blocks away from the intersection of North Gayoso and Iberville Street.

Court finds that Det. Cockerham ability to clearly witness a firearm being used in the encounter supports law enforcement's "belief that there was something illegal afoot." *Muse*, 2018 WL 6523383 at *8 (internal quotations omitted).

Next, the Court finds Det. Cockerham's testimony on Mr. Cooper's mannerisms persuasive because of his extensive work experience in drug and firearm related investigations. At the hearing, Det. Cockerham informed the Court that he has been employed with the New Orleans Police Department since 2009. From 2009-2018, he was assigned to the 5th Police District doing patrol, task force, and narcotics work. Since 2018, Det. Cockerham has been jointly assigned to the Federal Bureau of Investigation's Violent Crime task force. Based on Det. Cockerham's lengthy experience in cases related to the instant matter, the Court finds his testimony on Mr. Cooper's mannerisms credible and helpful. Particularly, Det. Cockerham testified that Mr. Cooper manipulated the object in his waistband similar to the way he has seen other individuals adjust concealed weapons. He further testified that when Mr. Cooper lifted his shirt and revealed that the object has a blue tip led him to believe that the object was a firearm with an extended magazine because he has become familiar with such weapons—with different colored tips—throughout his line of work. Thus, the Court finds the Det. Cockerham's testimony on Mr. Cooper's "suspicious movements" of the object in his waistband supports finding that law enforcement had reasonable suspicion when it conducted the *Terry* stop. *Tuggle*, 284 F. App'x at 223.

The Court stresses that law enforcement only arrived on the scene after witnessing all of the previous events.

Lastly, the Court considers the video evidence demonstrating that Mr. Cooper took flight after his initial encounter with Officer Enamorado. The video showed Officer Enamorado gesturing with his hands when speaking to Mr. Cooper. When asked by the Government to explain

what that gesture meant, Det. Cockerham explained that the officer requested Mr. Cooper to show his hands for safety purposes because he operated under the assumption that Mr. Cooper had a firearm. However, Mr. Cooper did not comply with the Officer's request. Instead, Mr. Cooper quickened his pace, looked back to Officer Enamorado who also quickened his pace, and then proceeded to run away from the officer. The Court finds it reasonable to infer that Officer Enamorado needed to move faster to reach Mr. Cooper rather than to provoke his flight. Further, only after Mr. Cooper noticed that the officer was moving quicker, did he start to run from Officer Enamorado. Accordingly, the Court finds that Mr. Cooper's "unprovoked flight" from the officer favors the finding that law enforcement had reasonable suspicion to stop Mr. Cooper. *Id.*

Though one of these facts alone would not necessarily support a finding of reasonable suspicion, law binding on this circuit requires the Court to its conclusion considering the totality of circumstances. *Wangler*, 987 F.2d at 230. Because the evidence establishes that (1) the stop occurred in a high crime area, (2) an individual that Mr. Cooper transacted with had a firearm; (3) Mr. Cooper manipulated an object on his person that appeared to be a weapon, and (4) when approached by Officer Enamorado, Mr. Cooper took flight, the Court finds that the Government demonstrated more than "a minimal level of objective justification" for New Orleans law enforcement to conduct the *Terry* stop. *Id*. Since the Court finds that law enforcement had reasonable suspicion to stop Mr. Cooper, it follows that his motion is denied.

## V.  CONCLUSION

For the foregoing reasons, Mr. Herbert Cooper's Motion to Suppress, R. Doc. 42, is **DENIED**.

New Orleans, Louisiana this 9th day of February, 2024.

_____
United States District Judge